UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARION KEITH NICHOLS,

Petitioner,

v. Case No. 3:23-cv-756-MMH-LLL

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

Respondent.

---

**ORDER**

## I. Status

Petitioner Marion Keith Nichols, a former inmate of the Florida penal system, initiated this action by filing a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 1). Nichols raises six grounds for relief, challenging a 2018 state court (Clay County, Florida) judgment of conviction for possession of child pornography. Respondent submitted a response in opposition with exhibits. (Docs. 7, 8). Nichols filed a reply. (Doc. 9). This case is ripe for review.[1]

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

## II. Factual Background and Procedural History

On May 14, 2017, the Clay County Sheriff's Office received a tip that Nichols "was in possession of child pornography." (Doc. 8-5 at 268). Detective Ryan Ellis interviewed Rebecca Shedd, the source of the tip. (Id.) Shedd claimed that five years earlier, a "family friend" had told her that Nichols "had child pornography on electronic devices inside of his residence." (Id.) After speaking with Shedd, Detective Ellis called Nichols and asked him to come to the police station for an interview. (Id.; Doc. 8-4 at 122–23). Nichols agreed to the interview, which took place on May 26, 2017. (Doc. 8-4 at 123; Doc. 8-5 at 268).

During the interview, Detective Ellis informed Nichols that "there were allegations that he had child pornography on electronic devices." (Doc. 8-4 at 123). Detective Ellis then asked for consent to search Nichols's cell phone. (Id.) Nichols declined, but he unlocked his cell phone and pulled up three photographs that Detective Ellis later characterized as "child erotica." (Id. at 123–25). One photograph showed two "prepubescent" girls wearing "skimpy bathing suits on a beach with their buttocks pushed out." (Id. at 125). Nichols admitted that he "didn't know the children" depicted in the photographs. (Id. at 126). According to him, he simply "like[d] to look at photos of children." (Id.) Nichols also stated that he "had seen child pornography previously," but that if he "had ever downloaded child pornography," he "would have deleted it." (Id.

at 127). After the interview, Nichols left the police station. (Id. at 128). At the time, Detective Ellis did not believe he had probable cause to arrest Nichols or obtain a search warrant. (Id.)

Detective Ellis discussed the investigation with Sgt. Gary Lavaron, his supervisor. (Id. at 128–29). Sgt. Lavaron suggested conducting a "trash pull" outside Nichols's residence. (Id.) Law enforcement ultimately conducted the trash pull around 7:00 a.m. on June 2, 2017—garbage collection day in the Nichols's neighborhood.[2] (Id. at 129, 186, 188). Officers found several trash cans "at the curb" of Nichols's house. (Id. at 114). They dumped the contents into the bed of a pickup truck and drove off. (Id. at 115). Among the trash were three floppy disks containing "numerous images of child erotica and suspected child pornography." (Id. at 130–31; Doc. 8-5 at 269). Officers also found a cell phone with "numerous search history logs/results related to child exploitation." (Doc. 8-5 at 269). The search terms on the cell phone included "lolitas 7yo" and "10 yo orgasm." (Id.)

Based in part on the evidence recovered from the trash pull, law enforcement obtained a search warrant for Nichols's residence. (Id. at 258–76). The search of the house uncovered "numerous" "images" and "videos" containing child pornography. (Doc. 8-4 at 135). Law enforcement submitted

[2] Earlier on June 2, between 1:00 a.m. and 2:00 a.m., law enforcement had tried to conduct a trash pull but found "no trash out" at the time. (Doc. 8-4 at 162–63).

the material to the National Center for Missing and Exploited Children, which confirmed that some of the images depicted "known victims, identified children that ha[d] been saved by law enforcement." (Id.)

On August 29, 2017, Nichols was charged with thirteen counts of possession of child pornography. (Id. at 97–99). Nichols moved to suppress the evidence recovered from his residence, arguing that the trash pull violated the Fourth Amendment because law enforcement "obtained the trash from behind [his] house." (Id. at 218). Following an evidentiary hearing, the trial court denied the motion to suppress. (Id. at 219). The court held that the evidence recovered from the trash pull "was legally obtained." (Id. at 218). According to the court, the trash cans were placed "only a couple feet off the side of the public road," and "the trash was sufficiently exposed to the public to defeat a reasonable expectation of privacy." (Id.) The court also found that "the officers did not retrieve the trash . . . from behind the Nichols'[s] home." (Id. at 218–19).

Nichols ultimately entered an open plea of guilty to ten counts of possession of child pornography. (Id. at 221–22, 231). The State nolle prossed the remaining three counts. (Id. at 228). On December 10, 2018, Nichols received a total sentence of nine years' imprisonment to be followed by fifteen years of sex offender probation. (Id. at 569–80). Nichols did not file a direct appeal. (Doc. 8-3 at 5). Instead, on December 27, 2019, he moved for

postconviction relief under Florida Rule of Criminal Procedure 3.850, arguing that trial counsel was ineffective in several respects. (Id. at 8–55). Nichols later filed an amended Rule 3.850 motion. (Id. at 67–124). After an evidentiary hearing, the postconviction court denied relief in a written order. (Doc. 8-5 at 4–26). On June 6, 2023, the Fifth District Court of Appeal (Fifth DCA) affirmed in an unexplained decision. (Doc. 8-8). This federal habeas petition followed. (Doc. 1).

## III. One-Year Limitations Period

This action was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

## IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318–19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474.

The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [Nichols's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), abrogation on other grounds recognized by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review of final state court decisions is "greatly circumscribed and highly deferential." Id. (internal quotation marks omitted) (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's

decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97–98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102–03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

**B. Exhaustion/Procedural Default**

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly

present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the """opportunity to pass upon and correct" alleged violations of its prisoners' federal rights."' Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365–66, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[3] supra, at 747–748, 111 S. Ct. 2546; Sykes,[4] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from

---

[3] Coleman v. Thompson, 501 U.S. 722 (1991).

[4] Wainwright v. Sykes, 433 U.S. 72 (1977).

the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[5] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal

[5] Murray v. Carrier, 477 U.S. 478 (1986).

> innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (first citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); and then Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that

> counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S. Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at ---, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable — a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at ---, 131 S. Ct. at 788.

Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014); Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference—this one to a state court's decision—when we are considering whether to grant federal habeas relief from a state court's decision." Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

Nichols alleges that the trial court violated his right to due process by allowing Detective Ryan Ellis to offer perjured testimony at the suppression hearing. (Doc. 1 at 5; Doc. 1-1 at 2). In the search-warrant affidavit, Detective Ellis stated that the trash pull took place on May 27, 2017. (Doc. 8-5 at 268). He confirmed this date at his deposition. (Doc. 8-3 at 259–60). During the suppression hearing, however, Detective Ellis testified that the trash pull "was actually done" on June 2, 2017. (Doc. 8-4 at 129–30). He explained that May 27 was a "typographical error" in the affidavit, that there "were a lot of dates, a lot of things going on in the investigation," and that he "was not there for the actual trash pull." (Id. at 129). According to Nichols, this discrepancy shows that Detective Ellis knowingly offered "false testimony" at the suppression hearing. (Doc. 1-1 at 2–3).

In another instance of alleged perjury, Detective Ellis testified at the suppression hearing that he learned about what happened during the trash pull from Detective Christopher Faircloth and two other officers. (Doc. 8-4 at 149). According to Detective Ellis, he relied on this "secondhand" information in drafting the search-warrant affidavit in July 2017. (Id.; Doc. 8-5 at 275). At

the suppression hearing, Detective Faircloth acknowledged that he participated in the trash pull on June 2, 2017. (Doc. 8-4 at 112–13). He stated, however, that he did not discuss the case with Detective Ellis until December 2017, when he prepared a supplemental report on the trash pull at Detective Ellis's request. (Id. at 118). Based on this conflicting testimony, Nichols argues that Detective Ellis committed "perjury" when he claimed to have discussed the trash pull with Detective Faircloth in July 2017. (Doc. 1-1 at 4).

Respondent correctly contends that Nichols failed to exhaust this claim. (Doc. 7 at 7). Nichols did not argue at the trial-court level that Detective Ellis committed perjury during the suppression hearing. And, as noted above, Nichols did not pursue a direct appeal. (Doc. 8-3 at 5). Likewise, Nichols did not raise a freestanding perjury claim in his Rule 3.850 motion. (Id. at 67–124). Instead, he raised a different claim: that trial counsel was ineffective for failing to challenge Detective Ellis's allegedly false testimony. (Id. at 114). For purposes of exhaustion, a substantive claim is "separate and distinct" from an ineffective-assistance claim based on the substantive claim. LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1260 n.24 (11th Cir. 2005). Indeed, "[a]n ineffective-assistance claim is analytically distinct from the substantive claim underlying it." Bailey v. Nagle, 172 F.3d 1299, 1304 (11th Cir. 1999). Thus, even if Nichols "exhausted his ineffective-assistance claim regarding [Detective Ellis's alleged perjury], his current substantive claim [that

Detective Ellis committed perjury] was not presented to the [Florida] courts." Id.; see also Phillips v. Sec'y, Dep't of Corr., No. 8:21-cv-960-WFJ-SPF, 2022 WL 2829631, at *3 (M.D. Fla. July 20, 2022) ("[Petitioner's] assertion of an ineffective assistance of trial counsel claim for failing to move to suppress because officers exceeded the scope of consent and searched the home without a warrant was not sufficient to exhaust his substantive Fourth Amendment violation claim.").[6]

Nichols cannot return to state court to present his unexhausted claim in an untimely direct appeal. See Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within thirty days of the rendition of a sentence). Nor can he raise it in a successive postconviction motion. See Fla. R. Crim. P. 3.850(b) (imposing two-year window of time to file motion for postconviction relief). As a result, Ground One is procedurally defaulted. See Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001) ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."). Because

---

[6] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

Nichols offers no basis to excuse his failure to exhaust, Ground One is barred from federal habeas review.

Even if the claim were not procedurally defaulted, it would fail on the merits. Nichols argues that Detective Ellis committed perjury, but he does not contend that the prosecutor knew the testimony was false. (Doc. 1-1 at 2–4). Although the Supreme Court "has held that the prosecutor's knowing use of perjured testimony violates due process, [it] has not held that the false testimony of a police officer in itself violates constitutional rights." Briscoe v. LaHue, 460 U.S. 325, 327 n.1 (1983); see also Napue v. Illinois, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." (emphasis added)); Jacobs v. Singletary, 952 F.2d 1282, 1287 n.3 (11th Cir. 1992) ("We have previously ruled that only knowing use of perjured testimony constitutes a due process violation." (citation omitted)). Absent applicable Supreme Court authority, Nichols cannot show that Detective Ellis's alleged perjury, in itself and without prosecutorial knowledge, entitles him to federal habeas relief. See Barajas v. Knowles, 392 F. App'x 538, 539–40 (9th Cir. 2010) (affirming denial of habeas petition because the Supreme Court had not "clearly established the rule that the admission of perjured testimony, unknown by the prosecutor to be false, violates due process").

Even if Nichols had alleged the required prosecutorial knowledge, he still would not be entitled to relief because he fails to establish that Detective Ellis committed perjury. "[D]eliberate deception of a court . . . by the presentation of known false evidence is incompatible with rudimentary demands of justice." Giglio v. United States, 405 U.S. 150, 153 (1972) (internal quotation marks omitted). "To establish prosecutorial misconduct for the use of false testimony, a defendant must show the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." United States v. McNair, 605 F.3d 1152, 1208 (11th Cir. 2010) (citations omitted). Thus, "[t]o succeed on [this] claim, the defendant must establish that the witness committed perjury." United States v. Clarke, 442 F. App'x 540, 544 (11th Cir. 2011). "Perjury is defined as testimony 'given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory.'" McNair, 605 F.3d at 1208 (quoting United States v. Ellisor, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008)). Moreover, courts generally "refuse to impute knowledge of falsity to the prosecutor where a key government witness'[s] testimony is in conflict with another witness's statement or testimony." United States v. Michael, 17 F.3d 1383, 1385 (11th Cir. 1994).

Nichols fails to establish that Detective Ellis committed perjury at the suppression hearing. According to Nichols, Detective Ellis falsely claimed at

the hearing that the trash pull took place on June 2, 2017. (Doc. 1-1 at 2–3). But the only evidence Nichols offers to support his accusation of perjury is that Detective Ellis gave a different date (May 27, 2017) in the search-warrant affidavit. (Doc. 8-5 at 268). "Mere testimonial inconsistency" is "insufficient to establish that the government's evidence was perjured." United States v. Tercier, 835 F. App'x 471, 478 (11th Cir. 2020).[7] As noted above, Detective Ellis explained that May 27 was a "typographical error" in the affidavit, and that he made the mistake because there "were a lot of dates, a lot of things going on in the investigation." (Doc. 8-4 at 129). Thus, "[i]nstead of showing perjury, . . . [Nichols] has demonstrated nothing more than a memory lapse, unintentional error, or oversight by [Detective Ellis]." United States v. Bailey, 123 F.3d 1381, 1395–96 (11th Cir. 1997).

Nor has Nichols shown that Detective Ellis perjured himself when he testified that he relied on reports from Detective Faircloth (and others) in drafting the search-warrant affidavit in July 2017. (Doc. 8-4 at 149; Doc. 8-5 at 275). To be sure, Detective Faircloth offered conflicting testimony, stating that he did not discuss the case with Detective Ellis until December 2017. (Doc. 8-

---

[7] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

4 at 118). But a "mere conflict in the testimony . . . establishes neither perjury nor mistake; it merely creates an issue for the [factfinder] to resolve in arriving at the facts." Smith v. Hearod, 498 F.2d 663, 666 (5th Cir. 1974);[8] see also James v. Gladish, No. 3:04-cv-297-HWM-MMH, 2005 WL 2548453, at *9 (M.D. Fla. Oct. 12, 2005) (petitioner failed to show perjury because his evidence "consist[ed] simply of conflicting statements made by witnesses during trial"). Because Nichols fails to prove that Detective Ellis was deliberately untruthful at the suppression hearing, Ground One lacks merit.[9]

**B. Ground Two**

Nichols raises three Sub-Claims in Ground Two, each of which rests on the assertion that Detective Christopher Faircloth perjured himself at the suppression hearing.

i. Sub-Claims One and Two

Nichols argues that the trial court violated his right to a "fair and adequate hearing" by allowing Detective Faircloth to offer false testimony at the suppression hearing. (Doc. 1 at 7; Doc. 1-1 at 5). Likewise, Nichols contends

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[9] To the extent that Nichols faults trial counsel for failing to challenge Detective Ellis's alleged perjury, the claim fails because there is no evidence that Detective Ellis perjured himself. See Bolender v. Singletary, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

that the prosecutor "suborn[ed] Detective Faircloth to commit this perjury." (Doc. 1-1 at 5). The alleged perjury involves Detective Faircloth's testimony about the date of the trash pull. At his deposition, Detective Faircloth testified that, although he did not "remember the actual date of the trash pull," Detective Ryan Ellis "provided the date of" June 2, 2017, "which [Detective Faircloth] used [in] his report." (Doc. 1-1 at 5). At the suppression hearing, the prosecutor asked Detective Faircloth whether he "had a chance to review [his] report." (Doc. 8-4 at 113). He said he did. (Id.) The prosector then asked, "Do you remember the date of the actual trash pull?" (Id.) Detective Faircloth responded, "Yes, ma'am, 6/2/17. It was on a Friday." (Id.) On cross-examination, Detective Faircloth acknowledged that Detective Ellis had "confirm[ed]" for him that the trash pull took place on June 2, 2017. (Id. at 117). Defense counsel then asked, "So other than that, you have no independent recollection of what date it was?" (Id.) Detective Faircloth testified that he "knew it was in the month of June" and reiterated that Detective Ellis had confirmed the date for him. (Id. at 117–18). According to Nichols, Detective Faircloth committed perjury when he stated on direct examination that the trash pull occurred on June 2, 2017. (Doc. 1-1 at 5–7).

Again, Respondent correctly contends that Nichols failed to exhaust these claims. (Doc. 7 at 11–15). Nichols did not argue at the trial-court level that Detective Faircloth perjured himself at the suppression hearing. And

Nichols opted to forgo a direct appeal. (Doc. 8-3 at 5). In his Rule 3.850 motion, Nichols did not present a freestanding claim based on Detective Faircloth's alleged perjury. (Id. at 67–124). Instead, he argued that trial counsel was ineffective for failing to show that Detective Faircloth's "testimony [was] boarding [sic] on perjury." (Id. at 100). As explained above, a substantive claim is "separate and distinct" from an ineffective-assistance claim based on the substantive claim. LeCroy, 421 F.3d at 1260 n.24. (11th Cir. 1999). Therefore, even if Nichols "exhausted his ineffective-assistance claim regarding [Detective Faircloth's alleged perjury], his current substantive claim[s] [were] not presented to the [Florida] courts." Bailey, 172 F.3d at 1304.

Nichols cannot return to state court to present his unexhausted claims in an untimely direct appeal. See Fla. R. App. P. 9.140(b)(3). Nor can he raise them in a successive postconviction motion. See Fla. R. Crim. P. 3.850(b). As a result, these claims are procedurally defaulted. See Smith, 256 F.3d at 1138. Because Nichols offers no basis to excuse his failure to exhaust, Ground Two, Sub-Claims One and Two are barred from federal habeas review.

Even if he had exhausted the claims, Nichols would not be entitled to relief. As explained above, the Supreme Court "has not held that the false testimony of a police officer in itself violates constitutional rights." Briscoe, 460 U.S. at 327 n.1. Instead, a petitioner must "show the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was

false testimony." McNair, 605 F.3d at 1208 (citations omitted). A threshold requirement of such a claim is that "the witness committed perjury." Clarke, 442 F. App'x at 544.

Nichols's claims fail because he does not establish that Detective Faircloth committed perjury. Detective Faircloth testified that, having reviewed his report, he remembered that the trash pull occurred on June 2, 2017. (Doc. 8-4 at 113). He later clarified that he did not have an "independent recollection" of the date, and that Detective Ellis had confirmed the date for him when he prepared his report. (Id. at 117–18). These statements do not show that Detective Faircloth "willful[ly] inten[ded] to provide false testimony." McNair, 605 F.3d at 1208 (internal quotation marks omitted). Rather, it appears that Detective Faircloth's initial testimony about the date was based on the information in the report. The exchange began with the prosecutor inquiring whether Detective Faircloth "had a chance to review [his] report." (Doc. 8-4 at 113). In response to the prosecutor's next question, Detective Faircloth gave the date "6/2/17," but he did not expressly state that his testimony was based on his present recollection. (Id.) Thus, Detective Faircloth's subsequent admission that he could not independently recall the exact date is not necessarily inconsistent with his earlier statement. At most, Detective Faircloth's initial testimony reflects "confusion" about the question he was asked. McNair, 605 F.3d at 1208 (internal quotation marks omitted).

Because Nichols fails to prove that Detective Faircloth perjured himself, these claims are due to be denied.

ii. Sub-Claim Three

Nichols separately argues that trial counsel was ineffective for failing to (1) object to Detective Faircloth's alleged perjury and (2) impeach Detective Faircloth with his deposition testimony. (Doc. 1-1 at 6–7). As noted above, Nichols claims that Detective Faircloth perjured himself at the suppression hearing when he testified that the trash pull occurred on June 2, 2017. (Id.) According to Nichols, counsel should have objected to the prosecutor's "subornation" of perjury by Detective Faircloth. (Id. at 6). Nichols also claims that counsel should have "conclusively impeach[ed]" Detective Faircloth at the suppression hearing by "enter[ing] [his] deposition transcript[]." (Id. at 7). During his deposition, Detective Faircloth had stated that he "did not remember the actual date of the trash pull" and that Detective Ellis "provided the date" of June 2, 2017. (Id. at 5).

Nichols raised this claim in his Rule 3.850 motion. (Doc. 8-3 at 100, 102, 111). The postconviction court held that counsel was not "deficient" because there was no indication that "counsel minimized or ignored purported inconsistent statements." (Doc. 8-4 at 12). Moreover, "[t]o the extent inconsistent statements were made, those inconsistencies were presented through the testimonies of the witnesses and some of those inconsistencies

were highlighted by counsel during his closing statement." (Id.) Finally, the court noted that even if "certain inconsistences were not presented during the suppression hearing," there was no basis to find that "the alleged inconsistencies would have changed the outcome of the suppression hearing." (Id.) The Fifth DCA affirmed the denial of relief without a written opinion. (Doc. 8-8).

To the extent that the Fifth DCA decided this issue on the merits,[10] the Court addresses the claim in accordance with the deferential standard for federal-court review of state-court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts given the evidence presented in the state-court proceedings. Nichols is therefore not entitled to relief on the basis of this claim.[11]

[10] Throughout this Order, in looking through the Fifth DCA's silent affirmance to the postconviction court's "relevant rationale," the Court presumes that the Fifth DCA "adopted the same reasoning." Wilson, 138 S. Ct. at 1194.

[11] Respondent argues that Nichols failed to properly exhaust this claim. (Doc. 7 at 16–19). The Court need not decide that issue because, even assuming Nichols exhausted his state-court remedies, he cannot show that the rejection of his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1), (2); see also Cook v. McNeil,

Even if the state-court adjudication is not entitled to deference, Nichols's Strickland claim lacks merit. First, as explained above, Nichols fails to show that Detective Faircloth committed perjury when he testified about the date of the trash pull. Thus, counsel was not deficient for failing to raise a meritless perjury claim. See Denson v. United States, 804 F.3d 1339, 1342 (11th Cir. 2015) ("Failing to make a meritless objection does not constitute deficient performance."). Second, counsel effectively impeached Detective Faircloth without resorting to the deposition transcript. On direct examination, Detective Faircloth testified that, after reviewing his report, he remembered that the trash pull occurred on June 2, 2017. (Doc. 8-4 at 113). On cross-examination, counsel got Detective Faircloth to admit that (1) he did not have an independent recollection of the date of the trash pull beyond knowing that "it was in the month of June," and (2) Detective Ellis had "confirm[ed]" for him that the trash pull took place on June 2, 2017. (Id. at 117–18). These are the two facts that, according to Nichols, counsel should have elicited by "enter[ing] [the] deposition transcript[]." (Doc. 1-1 at 7). Because counsel adequately impeached Detective Faircloth without using the deposition transcript, his performance was not deficient. See Grayson v. Thompson, 257 F.3d 1194, 1216

---

266 F. App'x 843, 846 (11th Cir. 2008) (affirming denial of habeas petition because, "[e]ven if [petitioner] exhausted his due process claim," he could not "establish either that the state courts applied a standard contrary to federal law or that they applied that precedent in an unreasonable manner").

(11th Cir. 2001) ("[I]n order to show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take." (emphasis omitted)).

**C. Ground Three**

Nichols's claims in Ground Three arise from Detective Ryan Ellis's consultation with two medical doctors, Emmanuel Pena and Randell Alexander, before applying for a search warrant for Nichols's house. (Doc. 1-1 at 9). As noted above, the trash pull outside the house yielded three floppy disks containing "numerous images of child erotica and suspected child pornography." (Doc. 8-5 at 269). Detective Ellis "examined" the images and believed that "some" displayed "children . . . engaged in sexual acts." (Id.) He also showed the images to Dr. Pena, a consultant with the "Child Protection Team." (Id.) Dr. Pena "examined the images . . . and stated he believe[d] several of the lewd images of the females [were] children." (Id.) Detective Ellis separately consulted with Dr. Alexander, another member of the Child Protection Team. (Id. at 140–41). Dr. Alexander had "different opinions" about the age of the persons depicted in the photographs. (Id. at 151–52). In particular, Dr. Alexander "could not definitely place an age on the images," although one series of photographs "appear[ed]" to depict a "younger female" who "could be a child." (Doc. 8-3 at 75). Ultimately, the search-warrant affidavit relied in part on Dr. Pena's opinion to establish probable cause for the

search. (Doc. 8-5 at 269). The affidavit did not mention Dr. Alexander's contrary opinion. (Id.)

i. Sub-Claim One

Nichols contends that the State "committed a discovery violation" by listing Dr. Pena and Dr. Alexander as "Category B witnesses." (Doc. 1-1 at 8–9). As a result of the Category B designation, Nichols could not depose the doctors "except on leave of court with good cause shown." Fla. R. Crim. P. 3.220(h)(1)(B). Nichols argues that this restriction on pretrial discovery violated his "right to confront witnesses" and constituted "fundamental error." (Doc. 1-1 at 8).

Respondent is correct that this claim is unexhausted. (Doc. 7 at 19–20). To satisfy the exhaustion requirement, a petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," either on direct appeal or on collateral review. Boerckel, 526 U.S. at 845. Nichols did not challenge the State's "Category B" designation at the trial-court level, he did not pursue a direct appeal, and he did not raise the alleged discovery violation in his Rule 3.850 motion. (Doc. 8-3 at 67–124). Nichols cannot return to state court to present his unexhausted claim in an untimely direct appeal. See Fla. R. App. P. 9.140(b)(3). Nor can he raise it in a successive postconviction motion. See Fla. R. Crim. P. 3.850(b). As a result, this claim is procedurally defaulted.

See Smith, 256 F.3d at 1138. Because Nichols offers no basis to excuse his failure to exhaust, Ground Three, Sub-Claim One is barred from federal habeas review.

Even if the claim were not procedurally defaulted, it would fail on the merits. As an initial matter, Nicholas cannot obtain federal habeas relief based on the State's alleged failure to comply with Florida law on the designation of witnesses. "[A] habeas petition grounded on issues of state law provides no basis for habeas relief." Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988); see also Cabberiza v. Moore, 217 F.3d 1329, 1333 (11th Cir. 2000) ("The writ of habeas corpus was not enacted to enforce state-created rights."). Thus, any alleged violation of Florida's discovery rules is not cognizable here. See Brown v. Sec., Fla. Dep't of Corr., No. 2:08-cv-447-CEH-DNF, 2011 WL 3875364, at *5 (M.D. Fla. Aug. 31, 2011) (alleged discovery violation under Florida law "cannot establish a federal constitutional violation"). Nichols also alleges that the designation of the doctors as Category B witnesses constituted fundamental error, but "the fundamental error question is an issue of state law."[12] Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1299 (11th Cir. 2017). "Because

---

[12] Under Florida law, "unpreserved errors" are reviewed on appeal for "fundamental error." Calloway v. State, 210 So. 3d 1160, 1191 (Fla. 2017). "An error so fundamental as to require reversal must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Id. (internal quotation marks omitted).

the fundamental error claim . . . does not assert the violation of a federally protected right, the claim is not cognizable in federal court." Lanier v. Sec'y, Dep't of Corr., No. 8:14-cv-323-SDM-TGW, 2023 WL 2664178, at *5 (M.D. Fla. Mar. 28, 2023); see also Joseph v. Sec'y, Dep't of Corr., 567 F. App'x 893, 894 (11th Cir. 2014) (allegation that erroneous jury instruction "caused fundamental error" was insufficient to "allege a federal constitutional claim").

Lastly, to the extent Nichols asserts a violation of the Confrontation Clause, the claim lacks merit. The Confrontation Clause "provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." Coy v. Iowa, 487 U.S. 1012, 1017 (1988) (internal quotation marks omitted). However, while "[t]he Confrontation Clause protects a defendant's trial right to confront testimony offered against him to establish his guilt, [it] has never extended . . . beyond the confines of a trial." United States v. Campbell, 743 F.3d 802, 808 (11th Cir. 2014). Thus, the right to confront witnesses "is not a constitutionally compelled rule of pre-trial discovery." United States v. Gates, 10 F.3d 765, 767 (11th Cir. 1993); see also United States v. Osmakac, 868 F.3d 937, 956 (11th Cir. 2017) (noting that the "right to confrontation is a right to certain constitutionally guaranteed trial procedures, not a basis for granting pretrial discovery").

Nichols alleges that the State violated the Confrontation Clause by listing Dr. Pena and Dr. Alexander as Category B witnesses—a designation that meant they could be deposed only "on leave of court with good cause shown." Fla. R. Crim. P. 3.220(h)(1)(B). But "[t]he right to confrontation does not create a concomitant right to pretrial discovery." United States v. Taylor, 178 F.4th 1017, 1024 (6th Cir. 2026). Therefore, any limitation on Nichols's ability to depose the doctors did not violate the Confrontation Clause.[13] See, e.g., United States v. Shrake, 515 F.3d 743, 746 (7th Cir. 2008) ("[C]onfrontation and cross-examination rights do not concern pretrial discovery . . . .").

ii. Sub-Claim Two

Nichols separately alleges that trial counsel was ineffective for failing to depose Dr. Pena and Dr. Alexander. (Doc. 1-1 at 10). Nichols does not specify the testimony that would have been elicited during such depositions. (Id. at 8–10). Nevertheless, he appears to contend that probable cause for the search

[13] In his reply, Nichols appears to contend that his right to confrontation was violated because the State did not call Dr. Pena or Dr. Alexander as witnesses at the suppression hearing. (Doc. 9 at 20–21). As explained above, the Eleventh Circuit "and other courts have declined to extend the right to confront witnesses to pre- and post-trial proceedings that do not concern the adjudication of a defendant's guilt or innocence." Campbell, 743 F.3d at 808 (citing United States v. Powell, 650 F.3d 388, 392-93 (4th Cir. 2011)). Thus, Nichols's "assum[ption] that the Sixth Amendment's Confrontation Clause is applicable during an evidentiary hearing on a motion to suppress" is "not supported by the case law." United States v. Bebris, 4 F.4th 551, 558 (7th Cir. 2021).

would have been negated by additional testimony about the doctors' "differing opinions" on the ages of the persons depicted in the images. (Id.; see also Doc. 8-3 at 77).

As Respondent correctly concedes, Nichols raised this claim in his Rule 3.850 motion. (Doc. 7 at 21; Doc. 8-3 at 77). Nevertheless, the postconviction court did not address the claim in its order denying relief. (Doc. 8-5 at 4–26). "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 568 U.S. 289, 301 (2013). The presumption is rebutted when the evidence clearly shows that the state court "inadvertently overlooked" the federal claim. Bester v. Warden, 836 F.3d 1331, 1336 (11th Cir. 2016). In such a case, federal courts review the claim de novo. Id. at 1337.

Here, even assuming that de novo review applies, Nichols has not shown that he is entitled to relief. See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review."). Specifically, Nichols fails to establish a reasonable probability that the trial court would have granted the

motion to suppress had counsel elicited additional testimony from Dr. Pena or Dr. Alexander. Therefore, Nichols suffered no prejudice from the failure to depose the doctors. See Arvelo v. Sec'y, Fla. Dep't of Corr., 788 F.3d 1345, 1348 (11th Cir. 2015) (noting that, for ineffective-assistance claims based on the failure to obtain suppression of evidence, "both the deficient performance and prejudice prongs of Strickland turn on the viability of the motion to suppress").

Nichols's contention that additional testimony from Dr. Pena and Dr. Alexander would have negated probable cause to search his house is unavailing. (Doc. 1-1 at 8–10; Doc. 8-3 at 77). "A sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair probability that . . . evidence of a crime will be found in a particular place." United States v. Lopez, 649 F.3d 1222, 1245 (11th Cir. 2011). "A 'fair probability,' in turn[,] exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains . . . evidence of a crime." Id. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). Notably, omissions from a search-warrant affidavit "will invalidate [the] warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997).

The information in the search-warrant affidavit established a "fair probability" that "evidence of a crime"—namely, possession of child pornography—would be found at Nichols's house. Lopez, 649 F.3d at 1245. Detective Ellis stated in the affidavit that he "examined the images [contained on the floppy disks] and believe[d] some of the images [depicted] children . . . engaged in sexual acts." (Doc. 8-5 at 269). Courts "have accepted, for purposes of an affidavit in support of a search warrant, the conclusory age estimates made by civilians and other untrained lay witnesses without demanding a detailed explanation of how the witnesses reached that conclusion." United States v. Battershell, 457 F.3d 1048, 1054 (9th Cir. 2006) (collecting cases). Moreover, the affidavit did not rely solely on Detective Ellis's examination of the images. It also cited the opinion of Dr. Pena, who "believe[d] several of the lewd images of the females [were] children." (Doc. 8-5 at 269). Aside from the images, the affidavit recounted that (1) a cell phone recovered from the trash pull contained search terms related to child pornography, including "lolitas 7yo" and "10 yo orgasm"; (2) Nichols showed Detective Ellis three images on his cell phone that contained "child erotica"; and (3) Nichols admitted to "lik[ing] to see pictures" of "young girls." (Id. at 268–69). Taken together, this information established a "fair probability" that child pornography would be found at Nichols's house. Lopez, 649 F.3d at 1245; see also United States v. Thomas, 818 F.3d 1230, 1244 (11th Cir. 2016) (officers had probable cause for

search where, among other things, "the police observed on [defendant's] computer two websites containing child erotica"); United States v. Breault, 344 F. App'x 358, 360 (9th Cir. 2009) (probable cause existed to search computer for child pornography where defendant "admitted" that "he was sexually attracted to girls around the age of 11 and 12" and "'hunted' on the internet using the search term 'Lolitas'").

As noted above, Nichols appears to contend that probable cause would have been negated by additional information about the doctors' "differing opinions" on the ages of the persons depicted in the images. (Doc. 1-1 at 8–10; see also Doc. 8-3 at 77). Unlike Dr. Pena, Dr. Alexander "could not definitely place an age on the images," although one series "appear[ed]" to depict a "younger female" who "could be a child." (Doc. 8-3 at 75). Even if this information had been included in the search-warrant affidavit, it would not have negated probable cause. "[A]s long as the totality of the evidence points to a substantial chance of a crime," a judge evaluating probable cause "is not required to sift through conflicting evidence or resolve issues of credibility." Turner v. Williams, 65 F.4th 564, 585 (11th Cir. 2023) (internal quotation marks omitted). In such a situation, "the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause." Paez v. Mulvey, 915 F.3d 1276, 1286 (11th Cir. 2019). For the reasons explained above, the affidavit established a "fair probability" that child pornography would be

found at Nichols's house. Lopez, 649 F.3d at 1245. Thus, Dr. Alexander's contrary opinion on the ages of the people in the images would not have vitiated probable cause. See id. (for purposes of evaluating probable cause, officer or judge "is not required to resolve every inconsistency found in the evidence"). Because any additional testimony on this point would not have affected the outcome of the suppression hearing, Nichols fails to establish Strickland prejudice. See Norris v. United States, No. 24-13306, 2025 WL 2700443, at *3 (11th Cir. Sept. 23, 2025) (requiring petitioner to show "a reasonable probability that a motion to suppress would have been granted").

**D. Ground Four**

Next, Nichols contends that trial counsel was ineffective for failing to investigate David Broskie, an Assistant Superintendent for the Clay County School District. (Doc. 1-1 at 11). Before his arrest, Nichols worked as a school bus driver for Clay County. (Doc. 8-5 at 295). On May 30, 2017—four days after interviewing Nichols—Detective Ryan Ellis spoke to Broskie. (Doc. 1-1 at 11). The purpose of the meeting "was to notify the School District of the investigation and to discover if the School District had any reports or allegations to share." (Doc. 8-3 at 73). During the meeting, Detective Ellis allegedly told Broskie that he was "in possession of evidence against" Nichols. (Id.) According to Nichols, this statement shows that officers had conducted an "illegal search" of his house on May 25, 2017, during which they "removed" a

cell phone with inculpatory evidence. (Id. at 72–73). In Nichols's view, the cell phone was the "evidence" to which Detective Ellis referred when speaking to Broskie. (Id. at 74). Nichols argues that counsel should have used this information to "impeach[] the alternative narrative provided by the police" during the suppression hearing. (Doc. 1-1 at 12).

The postconviction court rejected this claim, finding that Nichols failed to "show counsel's deficiency or prejudice." (Doc. 8-5 at 9). The court explained that "Broskie's alleged testimony [was] too vague to establish a corroboration of the" allegedly illegal search. (Id. at 8). According to the court, Nichols failed to "demonstrate that the 'evidence' [Detective] Ellis purportedly disclosed to Broskie referred to the cell phone." (Id.) The court noted that, before "communicat[ing] with Broskie," Detective Ellis had "spoke[n] with Rebecca Shedd, who stated she was aware [Nichols] had child pornography on his computer." (Id.) Additionally, Detective Ellis had "interviewed [Nichols] prior to the meeting with Broskie, and [Nichols] showed [Detective] Ellis pictures on a cell phone that [Detective] Ellis perceived as 'prepubescent' children in . . . 'skimpy' clothing photographed 'for sexual arousement.'" (Id.) Lastly, during the interview, Nichols had "made comments that he had seen child pornography." (Id. at 9). The court found that "[a]ny of those circumstances could have been the 'evidence' [Detective] Ellis was speaking about in his meeting with Broskie." (Id.) Thus, because Broskie's alleged testimony would

not have established an illegal search, the court held that Nichols could show neither deficient performance nor prejudice from the failure to investigate. (Id.) The Fifth DCA subsequently affirmed the denial of relief without a written opinion. (Doc. 8-8).

To the extent that the Fifth DCA decided this issue on the merits, the Court addresses the claim in accordance with the deferential standard for federal-court review of state-court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts given the evidence presented in the state-court proceedings. Nichols is therefore not entitled to relief on the basis of this claim.

Even if the state court's adjudication of this claim is not entitled to deference, Nichols's ineffective-assistance claim lacks merit. "Courts must indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (internal quotation marks omitted). "Thus, counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound . . . strategy." Id. (internal

quotation marks omitted). "Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one." Id.

Nichols has not met his burden. Detective Ellis allegedly told Broskie that law enforcement was "in possession of evidence against" Nichols. (Doc. 8-3 at 73). But, as the postconviction court explained, this statement does not prove that the "evidence" to which Detective Ellis referred was a cell phone illegally removed from Nichols's residence. (Doc. 8-5 at 8). The "evidence" could have been any number of facts uncovered before the conversation with Broskie, including the tip from Shedd, Nichols's admission that he had viewed child pornography in the past, and Nichols's possession of child erotica on his cell phone. (Id. at 8–9). Because Broskie's alleged testimony would not have established an illegal search, counsel was not deficient for failing to pursue the matter.[14] See Freeman v. Atty. Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

[14] In Ground Four, Nichols also raises a cumulative-error claim. (Doc. 1-1 at 12). The Court addresses this claim below.

### E. Ground Five

Nichols raises two Sub-Claims, both of which rest on the assertion that trial counsel should have objected to remarks the prosecutor made in her closing statement at the suppression hearing.

i. Sub-Claim One

According to Nichols, counsel was ineffective for failing to object when the prosecutor argued that Nichols's wife (Elvira Nichols) lacked credibility. (Doc. 1-1 at 15). As noted above, law enforcement claimed to have conducted a trash pull outside Nichols's house on June 2, 2017. (Doc. 8-4 at 129, 186, 188). Mrs. Nichols testified at the suppression hearing that on May 27, 2017, Nichols texted her while she was at work to let her know that he had disposed of their trash at "the landfill." (Id. at 181). Mrs. Nichols also stated that she and Nichols "did not put the trash out" on the evening of June 1 or the morning of June 2 because Nichols had been "suspended" from work and they "woke up late." (Id.) During her closing argument, the prosecutor addressed Mrs. Nichols's testimony: "[Mrs.] Nichols, of course, testified to the Court that she received a text message from this defendant stating that he went to the landfill because she was at work, but there is no evidence that she received a text message. We don't have a copy of the text message or any records stating that." (Id. at 210–11). Nichols contends that counsel should have objected to the prosecutor's "improper comment." (Doc. 1-1 at 15). According to Nichols, the

prosecutor could have "subpoena[ed] the phone records" before the suppression hearing, but she "chose not to." (Id.)

Nichols raised this ineffective-assistance claim in his Rule 3.850 motion, but the postconviction court did not address the issue in its order denying relief. (Doc. 8-3 at 94–95; Doc. 8-5 at 4–26). Even assuming that the claim was inadvertently overlooked and thus subject to de novo review, Nichols is not entitled to relief because he cannot show prejudice from the failure to object to the challenged remark. See Pope v. Sec'y, Fla. Dep't of Corr., 752 F.3d 1254, 1270 (11th Cir. 2014) (no prejudice where petitioner failed to "establish[] a reasonable probability that the outcome would have been different if counsel had objected to the prosecutor's remarks").

As an initial matter, the remark occurred during closing argument at a suppression hearing. The "trial judge" is "the fact finder in [a] hearing on [a] motion to suppress." State v. Moore, 791 So. 2d 1246, 1250 (Fla. 1st DCA 2001). As the "finder of fact," the judge "is presumed to have disregarded any inadmissible evidence or improper argument." Guzman v. State, 868 So. 2d 498, 510 (Fla. 2003); see also United States v. Stinefast, 724 F.3d 925, 931 (7th Cir. 2013) ("Judges often hear improper argument and other forms of inadmissible evidence that they are presumed to disregard when deciding matters of importance."). Nichols presents no evidence that the remark about Mrs. Nichols's testimony influenced the court's decision-making. Indeed, in the

order denying the motion to suppress, the court did not suggest that the absence of cell-phone records undermined Mrs. Nichols's credibility. (Doc. 8-4 at 213-19). In the absence of any indication that the court predicated its ruling on the challenged remark, Nichols cannot overcome the presumption that the court "disregarded any [allegedly] improper argument." Guzman, 868 So. 2d at 510.

Regardless, the prosecutor's remark was not improper. "The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence."[15] Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985). A "prosecutor is given wide latitude during closing argument." Tillman v. State, 306 So. 3d 292, 294 (Fla. 3d DCA 2020). For example, a prosecutor "may point out that there is an absence of evidence on a certain issue during closing argument." Smiley v. State, 395 So. 2d 235, 237 (Fla. 1st DCA 1981); see also Hogle v. State, 250 So. 3d 178, 180 (Fla. 1st DCA 2018) (prosecutor may "not[e] the lack of credible evidence to support [a defendant's] theory"). Here, the prosecutor pointed out that there was no corroborating "evidence" to support Mrs. Nichols's testimony "that she

[15] In addressing a related ineffective-assistance claim concerning closing argument at the suppression hearing (Ground Five, Sub-Claim Two), the postconviction court applied Florida case law on closing argument in jury trials. (Doc. 8-4 at 13). For purposes of this Order, the Court assumes that this case law applies to closing argument at a suppression hearing. Notably, neither party argues that the postconviction court erred in relying on such decisions.

received a text message" from Nichols about taking trash to the landfill. (Doc. 8-4 at 210–11). This was a fair comment on "the evidence as it exist[ed] before the [court]." White v. State, 377 So. 2d 1149, 1150 (Fla. 1979) (holding that prosecutor may "point out that there is an absence of evidence on a certain issue"). Because the remark was not improper, Nichols suffered no prejudice from the failure to object.[16] See United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992) ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client.").

ii. Sub-Claim Two

According to Nichols, counsel should have objected when the prosecutor stated at the suppression hearing that officers had previously made an "unsuccessful attempt [at a trash pull] . . . between 1:00 a.m. [and] 2:00 a.m. on the same day as the successful attempt." (Doc. 1-1 at 15–16). This comment was a reference to the testimony of Sgt. Gary Lavaron, who helped coordinate the trash pull. Sgt. Lavaron testified that between 1:00 a.m. and 2:00 a.m. on

[16] In Ground Five, Nichols points to minor inconsistencies in the officers' testimony about the exact time of the trash pull. (Doc. 1-1 at 13). For example, one officer stated that the trash pull occurred "between 6:30 and 7:00 a.m.," and another said it took place "between 7:00 and 8:00 a.m." (Id.) To the extent that Nichols faults counsel for not objecting to these conflicting statements, the claim fails for lack of prejudice. There is no reasonable probability that the motion to suppress would have been granted had counsel pointed out these minor discrepancies in the officers' testimony. See Wilson v. Sec'y, Dep't of Corr., No. 6:10-cv-422-CEH-KRS, 2013 WL 1499549, at *7 (M.D. Fla. Apr. 12, 2013) (no prejudice from failure to highlight "minor inconsistencies that did not completely contradict [a witness's] . . . testimony").

June 2, 2017, officers drove by Nichols's house and found "no trash out." (Doc. 8-4 at 162–63). Later that morning, officers went back to the house, found trash cans outside, and collected their contents. (Id. at 162). At the hearing, Sgt. Lavaron was asked "how many trash pulls were attempted prior to the successful [one]." (Id. at 163). He said, "The one that was earlier that morning of the day that trash was collected. And I believe there was an attempt on the previous week, but there was no trash out." (Id.) Detective Faircloth, for his part, testified that officers had tried to "do a trash pull" "at least once before" the successful attempt. (Id. at 113).

During closing argument, the prosecutor said, "At approximately 1:00 or 2:00 a.m. [on June 2, 2017], Detective Faircloth and Detective Elrod drove by that residence. No trash was out. That was the unsuccessful prior trash pull that they discussed during their testimony . . . ." (Id. at 206). The prosecutor acknowledged Detective Faircloth's testimony about a previous attempt to "do a trash pull," but she rejected the "defense" position that it took place on "May the 26th." (Id. at 206–07). Instead, according to the prosecutor, "[t]hey did unsuccessfully try to do a trash pull previously, but it was at 1:00 or 2:00 a.m. on June the 2nd." (Id. at 207).

Nichols argues that counsel was deficient for "offer[ing] no objection" to the prosecutor's statement. (Doc. 1-1 at 16). According to him, the prosecutor made "a deliberate misrepresentation designed to mislead" when she argued

that the prior unsuccessful trash pull took place in the early morning hours of June 2. (Id.) Nichols raised this claim in his Rule 3.850 motion. (Doc. 8-3 at 103–04). The postconviction court found that counsel was not ineffective because "any objection to the statement would have been without merit." (Doc. 8-5 at 20). As the court explained, "[c]losing arguments allow the State and defense to review the evidence and to explicate those inferences that may reasonably be drawn from the evidence." (Id. (internal quotation marks omitted)). The court held that "the prosecutor made an inference that was reasonably drawn from the evidence"—namely, that the prior attempt at a trash pull took place between 1:00 a.m. and 2:00 a.m. on June 2. (Id.) In the court's view, counsel could not be "deemed ineffective for failing to make a meritless argument." (Id. at 20–21 (internal quotation marks omitted)). The Fifth DCA affirmed the denial of relief without a written opinion. (Doc. 8-8).

To the extent that the Fifth DCA decided this issue on the merits, the Court addresses the claim in accordance with the deferential standard for federal-court review of state-court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts given the evidence

presented in the state-court proceedings. Nichols is therefore not entitled to relief on the basis of this claim.

Even if the state court's adjudication of this claim is not entitled to deference, Nichols's Strickland claim lacks merit. As noted above, a "prosecutor is given wide latitude during closing argument." Tillman, 306 So. 3d at 294. "Merely arguing a conclusion that can be drawn from the evidence is permissible fair comment." Mann v. State, 603 So. 2d 1141, 1143 (Fla. 1992). A "reasonable inference[] from the evidence" is that, as the prosecutor argued, the only prior attempt at a trash pull occurred between 1:00 a.m. and 2:00 a.m. on June 2. Miller v. State, 926 So. 2d 1243, 1254 (Fla. 2006). Sgt. Lavaron testified that a prior unsuccessful trash pull took place at that time. (Doc. 8-4 at 162–63). To be sure, he also stated that he "believe[d] there was an attempt on the previous week." (Id. at 163). But no other evidence supports this equivocal testimony. Indeed, Detective Ellis stated that a trash pull was not conducted the week before June 2. (Id. at 134–35). On this record, the prosecutor stayed within the "wide latitude" given to parties during closing argument. Tillman, 306 So. 3d at 294. Thus, the postconviction court correctly determined that counsel was not deficient because any objection to the prosecutor's remark would have failed.

Moreover, even if the remark were objectionable, Nichols fails to show prejudice because he offers nothing to overcome the presumption that the

court, as the finder of fact, "disregarded any . . . improper argument." Guzman, 868 So. 2d at 510. Without any evidence that the court "actually relied upon" the allegedly improper statement, Nichols cannot establish that the failure to object affected the decision on his suppression motion.[17] Petion v. State, 48 So. 3d 726, 730 (Fla. 2010).

### F. Ground Six

Nichols argues that the trial court violated his Eighth Amendment right against "excessive fines" by imposing a "domestic violence surcharge" of $1,608. (Doc. 1-1 at 17–18). According to Nichols, the surcharge applies only "to specific crimes identified in the statute," and the "crime for which [he] was convicted is not included in this list." (Id. at 18).

Respondent correctly contends that this claim is not cognizable on federal habeas review. (Doc. 7 at 61–62). Under § 2254, subject-matter jurisdiction exists "only for claims that a person 'is in custody in violation of the Constitution or laws or treaties of the United States.'" Dickerson v. United States, 530 U.S. 428, 439 n.3 (2000) (quoting 28 U.S.C. § 2254(a)). "[T]he monetary component of a sentence is not capable of satisfying the 'in custody'

[17] Respondent argues that this claim is unexhausted because Nichols "waived [it] by abandoning it on appeal of the postconviction order." (Doc. 7 at 23). The Court need not reach that issue because, as explained above, the claim fails on the merits. See Dallas v. Warden, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

requirement of federal habeas statutes." United States v. Ross, 801 F.3d 374, 380 (3d Cir. 2015). Thus, "[h]abeas corpus cannot be extended to challenges to non-custodial aspects of a sentence, even when a non-custodial claim is brought in the same petition as a custodial one." Ramdeo v. United States, 136 F.4th 1348, 1353 (11th Cir. 2025); see also Washington v. McQuiggin, 529 F. App'x 766, 773 (6th Cir. 2013) ("[C]ollateral relief from a noncustodial punishment, such as a fine or restitution order, is not made readily available to a defendant just because he happens at that time to also be subject to custodial penalties." (internal quotation marks omitted)).

Nichols seeks to challenge a "non-custodial aspect[] of [his] sentence"—the $1,608 domestic-violence surcharge. Ramdeo, 136 F.4th at 1353. This claim is not cognizable on federal habeas review because the surcharge "is insufficient to render [Nichols] 'in custody' for jurisdictional purposes." Reed v. Marshall, No. 4:18-cv-1790-LSC-GMB, 2022 WL 602511, at *3 (N.D. Ala. Jan. 7, 2022), adopted by 2022 WL 602178 (N.D. Ala. Feb. 28, 2022). To be sure, Nichols was serving a nine-year prison sentence when he filed his Petition, but Ground Six "attacks only the calculation of the amount he owes in" court fees. Washington v. Smith, 564 F.3d 1350, 1351 (7th Cir. 2009). This challenge to the monetary portion of his sentence "simply does not state a cognizable claim for relief under § 2254." Id. (imprisoned petitioner could not attack "restitution" obligation under § 2254 because, if he prevailed on that claim, "the only

possible benefit to him [would] be a lower payment to his victim; he [would] still be obligated to serve two and a half years in prison and three years on supervision").

## G. Cumulative Error

Finally, Nichols argues that the "cumulative effects of counsel's ineffective assistance" violated his rights under the Sixth Amendment. (Doc. 1-1 at 12). "Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." Insignares v. Sec'y, Fla. Dep't of Corr., 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail," however, where none of the "individual claims of error" has "any merit." Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012). Because each individual claim of error lacks merit, Nichols cannot show cumulative prejudicial effect.

## VII. Certificate of Appealability Pursuant to 28 U.S.C. § 2253(c)(1)

If Nichols seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Nichols "must demonstrate that reasonable jurists

would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335–36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1. The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2. The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3. If Nichols appeals the denial of the Petition, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4. The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 10th day of August, 2026.

Marcia Morales Howard

**MARCIA MORALES HOWARD**
United States District Judge

TpaP-2

C: Marion Keith Nichols, #G40173
Counsel of Record